# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| MEGAN PASTIAN, | : | Case No. 3:17-cv-00252 |
| --- | --- | --- |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | (by full consent of the parties) |
| INTERNAL CREDIT SYSTEMS, INC., et al., | : | |
| Defendants. | : | |

# ORDER

## I. Introduction

Plaintiff Megan Pastian brings this case against Defendant Internal Credit Systems, Inc. (ICS) under the Fair Debt Collections Practices Act (FDCPA), 15 U.S.C. §§1692, *et seq*, and the Ohio Consumer Sales Practices Act, Ohio Rev. Code §1345.02 and §1345.03. The case is presently pending upon Plaintiff's Motion for Partial Summary Judgment on her claims that ICS violated the FDCPA and the Ohio Consumer Sales Practices Act. Defendant ICS argues that Plaintiff lacks standing to bring a claim under the FDCPA and opposes Plaintiff's Motion for additional reasons.

## II. Factual Background

Plaintiff alleges in her Amended Complaint that in late 2016, she saw advertisements offering a gym membership—"Join for $1"—with Everybody Fitness,

LLC.¹  (Doc. #15, *PageID* #68).  After visiting an Everybody Fitness location, she declined an offer of a three-year membership but agreed to join for a maximum of one year.  She alleges that she was not given a written copy of the gym-membership contract to review before she signed a blank electronic tablet.  *Id*. at 70.

Problems soon arose.  She alleges that her credit card was charged $33.11 for the first month, not $1 as advertised.  *Id*. She further alleges that after she received a free personal training session, she declined to purchase two additional sessions at the offered price of $200 per session.  She eventually agreed to two training sessions, and she was charged $30 per session.  She alleges that she was not given a written personal-training contract to review before she signed an electronic tablet.  *Id*. at 71.

Plaintiff soon decided that she no longer wanted to be a member of the gym.  She "decided not to accept any further services from Everybody Fitness." *Id*.  She did not return to an Everybody Fitness facility.

On May 31, 2017, Defendant ICS sent a letter to Plaintiff identifying itself as "a debt collector."  (Doc. #48, *PageID* #406).  The letter advised Plaintiff that Everybody Fitness "has requested my office to collect this matter," stated an amount due of $3,343.52, and further stated, "This letter is to provide you with an opportunity to resolve this matter expeditiously." *Id*.  The letter continued:

> **Pursuant to the Fair Debt Collection Practices Act requires [sic] that we inform you that: unless you, within thirty (30) days after receipt of this initial notice, dispute the validity of the debt, or any portion thereof, the debt will be assumed valid by the debt collector. If you notify the debt collector in writing within the**

---
¹Also referred to as Every Body Fitness, LLC, in Plaintiff's Amended Complaint.

> **thirty-day period that the debt, or any portion thereof, is
> disputed, the debt collector will obtain verification of the debt ….**

*Id*. (emphasis in original).

Plaintiff read the letter and was confused by the amount of debt it stated. She testified during her deposition, "I was confused as to how they—they got that amount." (Doc. #56, *PageID* #629). She was also "confused as to who Internal Credit Systems was at that time I read the letter." *Id*. at 632. She "planned on calling the gym to see where they got that number, the amount that … was owed. I wanted to see how they came up with that number." *Id*. at 629-30. The letter caused Plaintiff significant stress and anxiety because she "was confused as to how they got that amount of money." *Id*. at 655.

A week later, on June 6, 2017, before Plaintiff contacted the gym, she received a voicemail message from ICS owner and founder Ted Lachman. He testified during his deposition that he founded ICS in 1999. He explained, "I just fell into it. I had a partner and he had some—I was working actually, I was doing some stuff at the gym. And he asked me to help him collect on something. All of a sudden, he said well, let's open a collection agency. And that's how it all got started." (Doc. #48, *PageID* #343).

Lachman bought his partner's ownership interest in ICS during its first year of operation, thus becoming its sole owner. *Id*. ICS employs Hieu Tran to handle "back-end stuff, putting contracts in and receipts and stuff…," and writing dispute letters *Id*. at 346. Tran sometimes very seldom talks with people from whom ICS is trying to collect a debt. Lachman testified, "His [Tran's] job is not to talk to people. That's what I do." *Id*. at 347. Lachman described ICS as "a little small operation…, very few calls a day. We

make enough to survive, very few calls….” *Id*. at 349-50. ICS does collection work only for gyms. *Id*. at 351.

During Lachman's deposition, a recording of the voicemail message he left for Plaintiff on June 6, 2017 was played. Lachman recognized his own voice on the recording. The recording says, "Yes, message for Megan. This is Ted Lachman giving you a call regarding a legal matter. My number is 1-877 …." *Id*. at 365. Lachman explained that he referred to a "legal matter" in his voicemail message because "it was a serious matter and we need to try to help her get it fixed…. I wanted to make sure she knew it was serious, to call me back." *Id*. at 366.

Plaintiff states in her sworn Declaration—prepared and executed before her deposition—that she did not know anyone named Ted Lachman. She further stated, "[U]pon hearing the voicemail, I felt sick and panicked. I thought my husband, Ben, or I had gotten into legal trouble." (Doc. #48, *PageID* #439).

Plaintiff returned the call that same day. Lachman answered. The parties dispute what happened next.

Plaintiff testified that Lachman "just went straight into yelling at me, telling me that I owed Every Body fitness money, and that I was going to pay them back." (Doc. #56, *PageID* #613). She tried to get Lachman to talk with her in a more professional manner. According to Plaintiff, Lachman called her "a bitch. He said that I was hallucinating to think that I was going to get out of paying the money…." *Id*. at 614. And, she said, "I was just really shocked and confused that somebody was talking to me the way he was talking to me." *Id*. She did not raise her voice or use profanity during the

phone call. *Id*. at 614-15. When asked how the phone call made her feel, Plaintiff testified, "It made me anxious. It was embarrassing. I was shocked. I was upset that someone talked to me that way and they weren't very professional." *Id*. at 683-84.

In her Declaration, Plaintiff alleges more:

> On or about June 6, 2017, I made a return call based on the voicemail I received. Mr. Lachman answered the phone. Mr. Lachman did not explain that he was a debt collector, nor did he explain to me that any information I gave him could be used to collect money from me. Mr. Lachman was loud, aggressive, pushy, and condescending with me on the phone. Mr. Lachman told me that I owed #3,343.52 to Everybody Fitness and needed to fix my mistake, or I could face "possible jail time." I was concerned and confused based on his comments. I asked to speak with someone else, and Mr. Lachman told me that he was the only person I would ever be able to talk to and that he would see me in court if I did not pay. Mr. Lachman then called me a "brat" and a "bitch," because I tried to insist that I did not owe the money to Everybody Fitness and there was some confusion. Mr. Lachman hung up on me.

(Doc. #48, *PageID* #439, ¶19). Plaintiff continues:

> He [Lachman] said that I was "hallucinating" if I thought I would ever get out of paying the money. Mr. Lachman's statements made me incredibly anxious, frustrated, and offended. I did not like how I was being treated so I told Mr. Lachman I would see an attorney about this. Mr. Lachman told me to go ahead and get an attorney because he was looking forward to "seeing me in court." Mr. Lachman hung up on me.

*Id*. at ¶20.

Plaintiff explained during her deposition that she started seeing a therapist once a week in February 2018. (Doc. #56, *PageID* #s 663-64). She takes prescription medication (Celexa) because her conversation on June 6, 2017 with Lachman "caused a lot of anxiety …." *Id*. at 665-66.

5

Lachman tells a different story. He testified that when Plaintiff called him back, he identified himself as a debt collector. He described Plaintiff as "nasty"; "she was ranting and raging and just—she didn't want to hear anything. So I listened to her. She was talking nonsense…. She just went on and on and on and didn't want to hear nothing and she wasn't paying it and this and this. And right at the end, she said I'm not paying you shit, I'm not paying Every Body Fitness shit, you can talk to my f**king lawyer, and hung up the phone." (Doc. #48, *PageID* #371). Lachman denied that he told Plaintiff he would bring a legal proceeding against her, and he absolutely did not threaten her with imprisonment if she didn't pay the debt. *Id*. at 371-72.

It is undisputed that about one week later, Plaintiff received another voicemail message. This message, played during Lachman's deposition, stated, "Message for Megan. This is Hieu Tran calling from Internal Credit Systems. We need to speak to you immediately regarding a personal business matter. My number is 1-877 …." *Id*. at 368.

Plaintiff testified during her deposition that when she returned Tran's call, she told him that she had retained counsel. She explained, "[H]e proceeded to tell me that I still owed the money and that I could call him with a debit card, credit card, or send a check in the mail if … I decided to pay it." (Doc. #56, *PageID* #622).

On June 16, 2017, Plaintiff's attorney sent a letter to ICS disputing the debt and asking ICS to provide validation of the debt. (Doc. #48, *PageID* #432). Hieu Tran responded by sending a letter to Plaintiff's counsel. He also provided Plaintiff's counsel with a copy of her contract. He indicated that her amount due was $3,343.52 and that she

6

had failed to make payments on her contract. After quoting some contract language, he wrote, "If she does not clear her balance, she will be sent to collections for all the unpaid months to the end of her contracts. Three late fees and three service fees. In order for this matter to be closed the balance is due. Once paid in full, she will receive a receipt stating nothing has been reported to her credit and the account is terminated." *Id*. at 433.

Plaintiff describes her harm in her sworn Declaration:

> The letter and the phone conversations have been incredibly stressful for me. During the conversations with Mr. Lachman, he made me feel anxious, frustrated, ignored, helpless, confused, and offended. Internal Credit System's attempts to collect money from me has increased my stress level and anxiety. I felt embarrassed, less confident and depressed that someone said I owed so much money so soon after Ben and I got married. Based on Mr. Lachman's statements, I was worried that Internal Credit Systems would escalate things to negative affect my credit and marriage to Ben. I was unsure if Internal Credit Systems would take me to court or take some other legal action that could cause me to lose my job as a bank teller and ruin my life. I am still in shock about how I was treated on the phone because I simply have never had such a hostile, offensive, and aggressive conversation with another person in a professional setting. Because of Internal Credit System's attempts to collect an alleged debt from me, I suffered severe emotional and mental distress.

*Id*. at 440, ¶27.[2]

---

[2] A summary-judgment subtlety should be noted here: It is proper to consider her Declaration at this point in the case because it was not created in an attempt to contradict her deposition testimony. Instead, it predates her deposition by slightly more than four months. *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 976 (6th Cir. 2019) (citation omitted) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony."). Her sworn Declaration is dated October 23, 2018. Her deposition occurred on March 1, 2019. Additionally, Defendant ICS's counsel had a copy of her Declaration and questioned her about it during her deposition. !

### III. Summary Judgment Standards

Summary judgment is available to a moving party who is able to "show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bear[s] the burden of showing the absence of a genuine issue of material fact as to at least one essential element of [Defendant's] claim." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986)).

### IV. Discussion—FDCPA and Standing

"Congress passed the FDCPA to address the widespread and serious national problem of debt collection abuse by unscrupulous debt collectors." *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 533 (6th Cir. 2014) (citing S.Rep. No. 95–382, at 2 (1977), 1977 U.S.C.C.A.N. 1695, 1696; 15 U.S.C. § 1692(a), (e)). "The goal of the FDCPA is to eliminate abusive debt collection practices." *Lyshe v. Levy*, 854 F.3d 855, 859 (6th Cir. 2017).

The FDCPA "prohibits a debt collector from the use of 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.'" *Wallace v. Washington Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012) (quoting, in part, 15 U.S.C. § 1692e). The FDCPA prohibits debt collectors from "a wide array of specific conduct…," *Currier*, 762 F.3d at 533, for instance, "false representation of—the character, amount, or legal status of any debt…,"; "[t]he representation or implication that nonpayment of any debt will result in arrest or imprisonment of any person…,"; [t]he threat to take any action that cannot legally be taken or that is not intended to be

taken…,"; "[t]he false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer…." 15 U.S.C. §§ 1692e(2)(A), (4), (5), (7). The FDCPA "also prohibits, in general terms, any harassing, unfair, or deceptive debt collection practice, which enables 'the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed.'" *Currier*, 762 F.3d at 533 (quoting, in part, S.Rep. No. 95–382, at 4, 1977 U.S.C.C.A.N. 1695, 1698; citing 15 U.S.C. §§ 1692d–1692f).

The FDCPA, 15 U.S.C. §1692k, "allows the consumer to recover statutory or actual damages for violations of the Act." *Wallace*, 683 F.3d at 326.

Plaintiff claims that ICS violated the FDCPA in the following ways:

1. falsely implying the existence of a legal action against her in Lachman's first voicemail message;

2. failing to identify itself as a debt collector in the first and second voicemail messages;

3. misrepresenting the character and amount of alleged debt it was trying to collect from her in the collection letter dated May 31, 2017;

4. threatening to negatively affect her credit; and

5. ICS's outrageous conduct during the two phone calls, including the use of obscene or profane language and threatening her with possible jail time if she did not pay the debt.

ICS argues that summary judgment is unwarranted on Plaintiff's FDCPA claims because "standing is a genuine issue of material fact precluding summary judgment." (Doc. #56, *PageID* #578) (capitalization and bold omitted). It further asserts:

There are…, genuine issues of material fact as to whether Plaintiff

9

> suffered any concrete harm sufficient to give rise to standing due to any technical violation of the FDCPA involving Defendant's failure to disclose it was a debt collector in its two voicemails. The Court cannot conclusively answer those questions because they are issues of fact for a jury to decide by weighing the credibility of witnesses and their positions. The inability of the Court to answer those questions means that it cannot determine whether Plaintiff had the requisite standing to bring her claim in this Court.

*Id*. at 578-79.

ICS's arguments rest on an incorrect premise. Rather than a factual issue, standing presents an issue of law for the Court to resolve. *Feiger v. Mich. Sup. Ct.*, 553 F.3d 955, 961 (6th Cir. 2009); *see Neal v. Jyoti Ltd.*, 2:18cv958, 2019 WL 3416255, *5 (S.D. Ohio 2019). Yet, this flaw in ICS's premise does not help Plaintiff much because she bears the burden of establishing standing and must show it for each of her claims. *See Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018). In addition, the merits of FDCPA claims, as presented in her Motion for Partial Summary Judgment, are not at issue until she establishes her standing. "Standing is a threshold issue for bringing a claim in federal court …." *Moody v. Michigan Gaming Control Board*, 847 F.3d 399, 402 (6th Cir. 2017). "Whether a party has standing is an issue of the court's subject matter jurisdiction …." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (citations omitted).

Standing derives from Article III of the Constitution, which extends federal judicial power only to actual "Cases" and "Controversies" rather than theoretical questions. U.S. Const. art. III, § 2; *see Hagy*, 882 F.3d at 620 (6th Cir. 2018). "That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 273 (2008). To

establish standing, Plaintiff must show: "(1) a particular and concrete injury (2) caused by [defendant] and (3) redressable by the courts." *Hagy*, 882 F.3d at 620 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Plaintiff contends that she has standing to litigate her FDCPA claims against ICS because its FDCPA violations caused her concrete and particularized emotional harm. She argues that she "felt stressed and anxious after receiving ICS's collection letter because the amount was outrageous and inaccurate. It is undisputed that [she] felt sick and panicked thinking that she or her husband may be in legal trouble after receiving a voicemail referencing a 'legal matter.'" (Doc. #58, *PageID* #703). Plaintiff also points to financial harm in that she incurred $525 in legal fees in requesting a validation letter from ICS.

The Sixth Circuit Court of Appeals has explained:

> *Spokeo* categorized statutory violations as falling into two broad categories: (1) where the violation of a procedural right granted by statute is sufficient in and of itself to constitute concrete injury in fact because Congress conferred the procedural right to protect a plaintiff's concrete interests and the procedural violation presents a material risk of real harm to that concrete interest; [or] (2) where there is a "bare" procedural violation that does not meet this standard, in which case a plaintiff must allege "*additional* harm beyond the one Congress has identified."

*Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747, 756 (6th Cir. 2018) (quoting, in part, *Spokeo, Inc. v. Robins*, __U.S.__, 136 S.Ct. 1540, 1549 (2016)).

The parties in the present case have not had an opportunity to address a recent case—*Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855 (6th Cir. 2020)—that delves into standing in the context of certain FDCPA claims. Because *Buchholz* appears to be

11

the most recent published FDCPA-standing case in the Sixth Circuit and because Article III standing is a threshold jurisdictional requirement, this Court must consider its significance before resolving whether Plaintiff has Article III standing.

**IT IS THEREFORE ORDERED THAT**:

1. Plaintiff's Motion for Partial Summary Judgment (Doc. #48) is DENIED without prejudice to renewal; and

2. **On or before April 20, 2020**, the parties shall brief the issue of whether Plaintiff has Article III standing to litigate each of her FDCPA claims in light of *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855 (6th Cir. 2020) and other pertinent case law.

March 30, 2020                                         *s/Sharon L. Ovington*
                                                                        Sharon L. Ovington
                                                                        United States Magistrate Judge