**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| MEGAN PASTIAN, | : | Case No. 3:17-cv-00252 |
| | : | |
| Plaintiff, | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | (by full consent of the parties) |
| | : | |
| INTERNAL CREDIT SYSTEMS, INC., | : | |
| et al., | : | |
| | : | |
| Defendants. | : | |

---

# DECISION AND ENTRY

---

## I.      Introduction

Plaintiff Megan Pastian brings this case against Defendant Internal Credit Systems, Inc. (ICS) under the Fair Debt Collections Practices Act (FDCPA), 15 U.S.C. §§ 1692, *et seq.*, and the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.02 and § 1345.03.  The case is presently pending upon Pastian's renewed Motion for Partial Summary Judgment.  ICS argues that Pastian lacks standing to bring a claim under the FDCPA, and ICS opposes Pastian's Motion for additional reasons.  The parties have submitted supplemental briefs addressing whether Pastian has standing to litigate her claims in this case.

## II.      Factual Background

Pastian alleges in her Amended Complaint that in late 2016, she saw advertisements offering a gym membership—"Join for $1"—with Everybody Fitness,

LLC.[1] (Doc. #15, *PageID* #68). After visiting an Everybody Fitness location, she declined an offer of a three-year membership but agreed to join for a maximum of one year. She alleges that she was not given a written copy of the gym-membership contract to review before she signed a blank electronic tablet. *Id*. at 70.

Problems soon arose. She alleges that her credit card was charged $33.11 for the first month, not $1 as advertised. *Id*. She further alleges that she received a free personal training session but declined to purchase two additional sessions at the offered price of $200 per session. She eventually agreed to two training sessions, and she was charged $30 per session. She alleges that she was not given a written personal-training contract to review before signing an electronic tablet. *Id*. at 71.

Pastian soon decided that she no longer wanted to be a member of the gym, and she "decided not to accept any further services from Everybody Fitness." *Id*. She did not return to an Everybody Fitness facility.

On May 31, 2017, Defendant ICS sent her a letter identifying itself as "a debt collector." (Doc. #48, *PageID* #406). The letter advised her that Everybody Fitness "has requested my office to collect this matter," stated an amount due of $3,343.52, and further stated, "This letter is to provide you with an opportunity to resolve this matter expeditiously." *Id*. The letter continued:

> **Pursuant to the Fair Debt Collection Practices Act requires [sic] that we inform you that: unless you, within thirty (30) days after receipt of this initial notice, dispute the validity of the debt, or any portion thereof, the debt will be assumed valid by the debt collector. If you notify the debt collector in writing within the**

---

[1]Also referred to as Every Body Fitness, LLC, in Plaintiff's Amended Complaint.

2

> **thirty-day period that the debt, or any portion thereof, is**
> **disputed, the debt collector will obtain verification of the debt** ….

*Id.* (emphasis in original).

Pastian read the letter and was confused by the amount of debt it stated, and she was also confused about "who Intern [sic] Credit Systems was at that time [she] had read the letter." (Doc. #56, *PageID* #632). She "planned on calling the gym to see where they got that number, the amount that … was owed. I wanted to see how they came up with that number." *Id.* at 629-30. The letter caused Pastian significant stress and anxiety because she "was confused as to how they got that amount of money." *Id.* at 655.

One week later, before Pastian contacted the gym, she received a voicemail message from ICS owner and founder Ted Lachman. He testified during his deposition that he founded ICS in 1999. He explained, "I just fell into it. I had a partner and he had some—I was working actually, I was doing some stuff at the gym. And he asked me to help him collect on something. All of a sudden, he said well, let's open a collection agency. And that's how it all got started." (Doc. #48, *PageID* #343).

Lachman bought his partner's ownership interest in ICS during its first year of operation, thus becoming its sole owner. *Id.* ICS employs a man named Hieu Tran to handle "back-end stuff, putting contracts in and receipts and stuff…," and writing dispute letters *Id.* at 346. Tran sometimes, but very seldom, talks with people from whom ICS is trying to collect. Lachman testified, "His [Tran's] job is not to talk to people. That's what I do." *Id.* at 347. Lachman described ICS as "a little small operation…, very few calls a day. We make enough to survive, very few calls…." *Id.* at 349-50. ICS does

collection work only for gyms.  *Id*. at 351.

During Lachman's deposition, a recording of the voicemail message he left for Pastian was played.  Lachman recognized his own voice on the recording.  The deposition transcript documents the message as saying, "Yes, message for Megan.  This is Ted Lachman giving you a call regarding a legal matter.  My number is 1-877 …." (Doc. #48, *PageID* #365).  Lachman's voicemail then ended.  He explained during his deposition that he referred to a "legal matter" in his voicemail message because "it was a serious matter and we need to try to help her get it fixed….  I wanted to make sure she knew it was serious, to call me back."  *Id*. at 366.

Pastian states in her sworn Declaration—prepared and executed before her deposition—that she did not know anyone named Ted Lachman.  She further stated, "[U]pon hearing the voicemail, I felt sick and panicked.  I thought my husband, Ben, or I had gotten into legal trouble."  (Doc. #48, *PageID* #439).

Pastian returned the call that same day.  Lachman answered.  The parties dispute what happened next.  Pastian testified that Lachman "just went straight into yelling at me, telling me that I owed Every[b]ody fitness money, and that I was going to pay them back."  (Doc. #56, *PageID* #613).  She tried to get Lachman to talk with her in a more professional manner.  According to Pastian, Lachman called her "a bitch.  He said that I was hallucinating to think that I was going to get out of paying the money…."  *Id*. at 614. And she explained, "I was just really shocked and confused that somebody was talking to me the way he was talking to me."  *Id*.  She did not raise her voice or use profanity during the phone call.  *Id*. at 614-15.  When asked how the phone call made her feel, Pastian

4

testified, "It made me anxious. It was embarrassing. I was shocked. I was upset that someone talked to me that way and they weren't very professional." *Id*. at 683-84.

In her Declaration, Pastian alleges more:

> On or about June 6, 2017, I made a return call based on the voicemail I received. Mr. Lachman answered the phone. Mr. Lachman did not explain that he was a debt collector, nor did he explain to me that any information I gave him could be used to collect money from me. Mr. Lachman was loud, aggressive, pushy, and condescending with me on the phone. Mr. Lachman told me that I owed $3,343.52 to Everybody Fitness and needed to fix my mistake, or I could face "possible jail time." I was concerned and confused based on his comments. I asked to speak with someone else, and Mr. Lachman told me that he was the only person I would ever be able to talk to and that he would see me in court if I did not pay. Mr. Lachman then called me a "brat" and a "bitch," because I tried to insist that I did not owe the money to Everybody Fitness and there was some confusion. Mr. Lachman hung up on me.

(Doc. #48, *PageID* #439, ¶19). Pastian continues:

> He [Lachman] said that I was "hallucinating" if I thought I would ever get out of paying the money. Mr. Lachman's statements made me incredibly anxious, frustrated, and offended. I did not like how I was being treated so I told Mr. Lachman I would see an attorney about this. Mr. Lachman told me to go ahead and get an attorney because he was looking forward to "seeing me in court." Mr. Lachman hung up on me.

*Id*. at ¶20.

Lachman tells a different story. He testified that when Pastian called him back, he identified himself as a debt collector. He described Pastian as "nasty"; "she was ranting and raging and just—she didn't want to hear anything. So I listened to her. She was talking nonsense.… She just went on and on and on and didn't want to hear nothing and she wasn't paying it and this and this. And right at the end, she said I'm not paying you

5

shit, I'm not paying Every[b]ody Fitness shit, you can talk to my f**king lawyer, and hung up the phone."  (Doc. #48, *PageID* #371).  Lachman denied that he told Pastian he would bring a legal proceeding against her, and he absolutely did not threaten her with imprisonment if she didn't pay the debt.  *Id*. at 371-72.

It is undisputed that about one week later, Pastian received another voicemail message.  This message, played during Lachman's deposition, stated, "Message for Megan.  This is Hieu Tran calling from Internal Credit Systems.  We need to speak to you immediately regarding a personal business matter.  My number is 1-877 …."  *Id*. at 368.

Pastian testified during her deposition that when she returned Tran's call, she told him that she had retained counsel.  She explained, "[H]e proceeded to tell me that I still owed the money and that I could call him with a debit card, credit card, or send a check in the mail if … I decided to pay it."  (Doc. #56, *PageID* #622).

On June 16, 2017, Pastian's attorney sent a letter to ICS disputing the debt and asking ICS to provide validation of the debt.  (Doc. #48, *PageID* #432).  Hieu Tran responded by sending a letter to Pastian's counsel.  He also provided Pastian's counsel with a copy of her contract.  He indicated that her amount due was $3,343.52 and that she had failed to make payments on her contract.  After quoting some contract language, he wrote, "If she does not clear her balance, she will be sent to collections for all the unpaid months to the end of her contracts.  Three late fees and three service fees.  In order for this matter to be closed the balance is due.  Once paid in full, she will receive a receipt stating nothing has been reported to her credit and the account is terminated."  *Id*. at 433.

Pastian describes the harm she suffered in her sworn Declaration:

> The letter and the phone conversations have been incredibly stressful for me.  During the conversations with Mr. Lachman, he made me feel anxious, frustrated, ignored, helpless, confused, and offended.  Internal Credit System's attempts to collect money from me has increased my stress level and anxiety.  I felt embarrassed, less confident and depressed that someone said I owed so much money so soon after Ben and I got married.  Based on Mr. Lachman's statements, I was worried that Internal Credit Systems would escalate things to negative affect my credit and marriage to Ben.  I was unsure if Internal Credit Systems would take me to court or take some other legal action that could cause me to lose my job as a bank teller and ruin my life.  I am still in shock about how I was treated on the phone because I simply have never had such a hostile, offensive, and aggressive conversation with another person in a professional setting.  Because of Internal Credit System's attempts to collect an alleged debt from me, I suffered severe emotional and mental distress.

*Id*. at 440, ¶27.[2]

## III.    Summary Judgment Standards

Summary judgment is available to a moving party who is able to "show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

"On those issues for which it shoulders the burden of proof, the moving party must make a showing that is 'sufficient for the court to hold that no reasonable trier of fact

---

[2]A summary-judgment subtlety should be noted here:  It is proper to consider Plaintiff's Declaration at this point in the case because it was not created in an attempt to contradict her deposition testimony. Instead, it predates her deposition by slightly more than four months.  *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 976 (6th Cir. 2019) (citation omitted) ("A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony.").  Her sworn Declaration is dated October 23, 2018.  Her deposition occurred on March 1, 2019.  Additionally, Defendant ICS's counsel had a copy of her Declaration and questioned her about it during her deposition.

could find other than for the moving party.'" *Mountain Top Beverage Group, Inc. v. Wildlife Brewing N.B., Inc*., 338 F.Supp.2d 837, 839 (S.D. Ohio 2004) (quoting, in part, *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986)). "For those issues where the moving party will *not* have the burden of proof at trial, the movant must 'point[ ]out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Guzman v. Denny's Inc*., 40 F.Supp.2d 930, 932 (S.D. Ohio 1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 319 (1986)). In both situations the evidence, facts, and inferences are viewed in the light most favorable to the nonmoving party. *Nickels v. Grand Trunk Western R.R., Inc*., 560 F.3d 426, 429 (6th Cir. 2009) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)).

Pastian seeks partial summary judgment in her favor establishing ICS's FDCPA liability only; she requests a hearing to determine her damages. She acknowledges that to recover under the FDCPA, she must prove the elements of at least one of her FDCPA claims. (Doc. #48, *PageID* #s 323-24). Given her burden of proof, she wins partial summary judgment if she shows that the evidence, facts, and inferences—viewed in the light most favorable to ICS—are "'sufficient for the court to hold that no reasonable trier of fact could find other than for…,'" her on the merits of at least one of her FDCPA claims. *Mountain Top Beverage*, 338 F.Supp.2d at 839 (quoting, in part, *Calderone,* 799 F.2d at 259).

Pastian, the party invoking subject matter jurisdiction, shoulders the burden to establish she has standing under Article III of the Constitution to litigate each of her claims. *See Kanuszewski v. Michigan Dep't of HHS*, 927 F.3d 396, 405 (6th Cir. 2019)

8

(citation omitted); *see also Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018).

**IV.    Discussion**

**A.    The FDCPA And Pastian's Claims**

"Congress passed the FDCPA to address the widespread and serious national problem of debt collection abuse by unscrupulous debt collectors."  *Currier v. First Resolution Inv. Corp.*, 762 F.3d 529, 533 (6th Cir. 2014) (citing S.Rep. No. 95–382, at 2 (1977), 1977 U.S.C.C.A.N. 1695, 1696; 15 U.S.C. § 1692(a), (e)).  "The goal of the FDCPA is to eliminate abusive debt collection practices."  *Lyshe v. Levy*, 854 F.3d 855, 859 (6th Cir. 2017).

The FDCPA "prohibits a debt collector from the use of 'any false, deceptive, or misleading representation or means in connection with the collection of any debt.'" *Wallace v. Washington Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012) (quoting, in part, 15 U.S.C. § 1692e).  The FDCPA bans "a wide array of specific conduct …." *Currier*, 762 F.3d at 533.  Debt collectors may not engage in the "false representation of—the character, amount, or legal status of any debt…,"; "[t]he representation or implication that nonpayment of any debt will result in arrest or imprisonment of any person…,"; "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken…,"; or "[t]he false representation or implication that the consumer committed any crime or other conduct in order to disgrace the consumer…."  15 U.S.C. §§ 1692e(2)(A), (4), (5), (7).  The FDCPA "also prohibits, in general terms, any harassing, unfair, or deceptive debt collection practice, which enables 'the courts, where appropriate, to proscribe other improper conduct which is not specifically addressed.'"

*Currier*, 762 F.3d at 533 (quoting, in part, S.Rep. No. 95–382, at 4, 1977 U.S.C.C.A.N. 1695, 1698; citing 15 U.S.C. §§ 1692d–1692f).

The FDCPA, 15 U.S.C. § 1692k, "allows the consumer to recover statutory or actual damages for violations of the Act." *Wallace*, 683 F.3d at 326.

Pastian claims that ICS violated the FDCPA in the following ways:

1. falsely implying the existence of a legal action against her in Lachman's first voicemail message;

2. failing to identify itself as a debt collector in the first and second voicemail messages;

3. misrepresenting the character and amount of alleged debt it was trying to collect from her in the collection letter dated May 31, 2017;

4. threatening to negatively affect her credit; and

5. committing outrageous acts during the two phone calls, including the use of obscene or profane language and threatening her with possible jail time if she did not pay the debt.

She contends that she is entitled to partial summary judgment because no genuine issues of material fact exist concerning each element of her claims that ICS's voicemail messages, letters, and telephone calls violated the FDCPA.[3]  Yet, before this contention can be reached, ICS's standing challenge must be resolved.  "Because standing doctrine comes from Article III's case-or-controversy requirement, it is jurisdictional and must be addressed as a threshold matter." *Kanuszewski*, 927 F.3d at 405 (citation omitted).

---

[3] Plaintiff also contends that a violation of the FDCPA is also violation the Ohio Consumer Sales Practices Act.  This, she argues, entitles her to summary judgment on her state-law claims.

10

**B.**     <u>**Article III Standing**</u>

**1.**

ICS initially opposed Pastian's Motion for Partial Summary Judgment on the ground that genuine issues of material fact exist regarding whether she suffered an injury-in-fact sufficient to establish that she has standing under Article III of the Constitution. The Court previously rejected this contention because standing presents an issue of law for the Court to resolve rather than a factual issue. *Feiger v. Mich. Sup. Ct.*, 553 F.3d 955, 961 (6th Cir. 2009); *see Neal v. Jyoti Ltd.*, 2:18cv958, 2019 WL 3416255, *5 (S.D. Ohio 2019); *see also* Doc. #61, *PageID* #721. As a result, when the Court previously denied without prejudice Pastian's Motion for Partial Summary Judgment, the existence of her Article III standing remained unresolved.

Also at that time, the parties had not had an opportunity to brief the issue of Pastian's standing in light of *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 868 (6th Cir. 2020)—a significant standing case that post-dates the parties' summary-judgment memoranda. (Doc. #61, *PageID* #s 722-23). And *Buchholz*'s analysis and application of *Spokeo, Inc. v. Robins*, ––– U.S. ––––, 136 S. Ct. 1540, 1547 (2016) is instructive and pertinent to the parties' contention in the case at hand.

The parties have since supplemented their briefs, addressing *Buchholz* and whether Pastian has Article III standing to litigate her FDCPA claims. Pastian, moreover, has renewed her Motion for Partial Summary Judgment. ICS maintains its position that she lacks standing due to her lack of an injury in fact.

**2.**

"[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his [or her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his [or her] behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (citation omitted); *see MX Grp., Inc. v. City of Covington*, 293 F3d 326, 332 (6th Cir. 2002).

The parties agree that to establish standing, a plaintiff "must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Buchholz*, 946 F.3d at 861 (quoting, in part, *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S. Ct. 1540, 1547 (2016)). The parties disagree over whether Pastian can show she suffered an injury sufficient to satisfy standing's injury-in-fact element. Indeed, ICS argues that the emotional distress Pastian alleges in her First Amended Complaint—sleepless nights, fear of jailtime, anxiety, and stress—is not severe and therefore fails to constitute an injury in fact sufficient to establish she has standing.

"[A]n injury in fact must be both '(a) concrete and particularized, … and (b) actual or imminent, not conjectural or hypothetical[.]'" *Id.* (quoting, in part, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130 (1992) (internal quotation marks and citations omitted)). An injury is concrete when it is "'real and not abstract.'" *Id.* (quoting *Spokeo*, 136 S.Ct. at 1548). "'Concrete' is not, however, necessarily synonymous with 'tangible.' Although tangible injuries are perhaps easier to recognize…, intangible injuries can nevertheless be concrete." *Spokeo*, 136 S.Ct. at 1549; *cf. Thole v. U. S. Bank N.A*, —— U.S. ——, 2020 WL 2814294, at *13 (2020)

12

(Sotomayor, J. dissenting) ("But injury to a plaintiff's wallet is not, and has never been, a prerequisite for standing. The Constitution permits federal courts to hear disputes over nonfinancial injuries like the harms alleged here."). When does an intangible injury solidify into a concrete injury?

Enter *Buchholz* where the Sixth Circuit concluded that the plaintiff lacked standing in part because his alleged anxiety, which it viewed as connected to his fear of future harm (which appeared to be "self-inflicted"), was not fairly traceable to the defendant's conduct. 946 F3d at 866-67. This conclusion made it unnecessary for the Sixth Circuit in *Buchholz* to "decide whether a bare anxiety allegation, in the abstract, fails to satisfy the injury-in-fact requirement." *Id*. at 865.

ICS ignores that *Buchholz* did not resolve whether anxiety alone can constitute an injury in fact. It instead argues, "The *Buchholz* court explained…, 'general allegations of emotional harm, no matter how deeply felt, cannot suffice for the injury-in-fact for standing purposes.'" (Doc. #63, *PageID* #743) (quoting, in part, *Buchholz*, 946 F.3d at 861). Borrowing tort language from *Buchholz*, ICS argues that Pastian lacks standing because she has failed to allege ICS engaged in "'extreme and outrageous conduct'" that caused her "'severe emotional harm.'" *Id*. at 743-44 (quoting, in part, *Buchholz*, 946 F.3d at 864). ICS's reliance on this language from *Buchholz* is misplaced because it targets dicta. The tort-law language ICS relies on was not integral to the holding that Buchholz lacked standing; it merely explained the *Buchholz* majority's skepticism over whether anxiety, alone, may constitute a concrete injury in fact. 946 F.3d at 861-66 ("Thus, Buchholz's failure to allege anything other than anxiety makes us skeptical about

13

whether he has an injury in fact.").  But skepticism is not certainty.  And certainty—

indeed, a holding from *Buchholz*—is the keystone missing from ICS's reliance on it.

Additionally, one Judge on the *Buchholz* panel did not concur with the majority's

skepticism.  He wrote, "I cannot … join in the parts of the opinion that express doubt

over whether mental anxiety can create a 'Case' or 'Controversy' under Article III of the

Constitution."  *Id.* at 870 (Murphy, C.J., concurring in part and in the judgment).  He

continued:

> If a plaintiff's claim is sufficiently particularized…, I tend to
> think that mental distress satisfies any additional concreteness
> requirement.  I reach that conclusion for a simple reason: It comports
> with a long tradition of allowing plaintiffs to sue for mental-distress
> damages.  *Cf. Vt. Agency*, 529 U.S. at 773-78 ….  "Distress,"
> including "mental suffering or emotional anguish," "is a personal
> injury familiar to the law, customarily proved by showing the nature
> and circumstances of the wrong and its effect on the plaintiff."  *Carey
> v. Piphus*, 435 U.S. 247, 263–64 & n.20 … (1978).  Recovery for that
> type of injury has been part of our common-law tradition for
> centuries.  *See, e.g.*, Joseph Henry Beale, *Collection of Cases on the
> Measure of Damages* 337-63 (1895) (collecting cases); *see also*
> Arthur G. Sedgwick, *Elements of Damages: A Handbook for the Use
> of Students and Practitioners* 98-105 (1896).  "In a variety of actions
> founded on personal torts, and in many where no positive bodily harm
> has been inflicted, the plaintiff is permitted to recover for injury to the
> feelings and affections, for mental anxiety, personal insult, and that
> wounded sensibility which follows the invasion of a large class of
> personal rights."  *Ballou v. Farnum*, 93 Mass. 73, 77 (1865).

*Id.* at 873.  This reveals tension in *Buchholz* over whether, in FDCPA cases, anxiety

alone can constitute an injury in fact for standing purposes.  And this tension—plus the

dicta upon which ICS relies—is fatal to its reasoning that each of Pastian's FDCPA

claims collapses because she fails to describe any extreme and outrageous conduct by

ICS that caused her serious emotional injury.

14

Although there was no need in *Buchholz* to answer whether anxiety alone may constitute an injury in fact in FDCPA cases, multiple general principles can be extracted from the heart of *Buchholz*:

1. [S]ome concrete, intangible injuries may also flow from statutory violations. *Spokeo*, 136 S.Ct. at 1549. Congress may define "injuries and articulate chains of causation that will give rise to a case or controversy where none existed before[.]" *Buchholz*, 946 F.3d at 862 (citation omitted).

2. "Congress'[s] role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* (quoting, in part, *Spokeo*, 136 S.Ct. at 1549).

3. "[N]ot *all* procedural violations open the door to federal court. But *some* do, even when the procedural violation causes only an intangible injury." *Id.* (italics in original) (citing *Spokeo*, 136 S.Ct. at 1550).

4. "[I]f the plaintiff alleges a violation of a procedural right that protects a concrete interest, the plaintiff need not allege any *additional* harm beyond the one Congress has identified." *Id.* at 868 (italics in original) (citing *Spokeo*, 136 S.Ct. at 1550).

5. But this does not mean that "Congress can, by statute, declare an injury concrete when the injury "is, in fact, abstract and non-cognizable." *Id*.

6. There is no bright-line rule for when a procedural violation, alone, rises to the level of an injury in fact sufficient to support standing. *Id*. at 862-63.

The lack of a bright-line rule mobilizes two factors from *Spokeo* to determine whether an intangible injury is concrete—namely, the history of common law and the judgment of Congress. *Id*. at 863, 868.

Looking first to the judgment of Congress, *Buchholz* observed, "In the FDCPA, Congress created procedural rights and provided consumers with a cause of action to vindicate those rights." *Id*. at 867. And, "Congress passed the FDCPA to prevent debt

collectors from engaging in abusive debt-collection practices." *Id*. at 870. Having thus identified congressional judgment in enacting the FDCPA, *Buchholtz* examined three cases to "further clarify when an FDCPA violation creates an injury in fact." *Id*.

*Buchholz* first discussed *Hagy* in which a lender's attorney sent a letter to the plaintiffs' attorney informing him that the plaintiffs would not have to pay the balance owed on their loan. The lender's attorney, however, did not state that he was a debt collector—a violation of the FDCPA. *Id*. at 868 (citing *Hagy*, 882 F.3d at 618-19). The Sixth Circuit found that the FDCPA violation caused the plaintiffs no harm—tangible or intangible—because the lender's attorney provided good news to them by relieving them of their obligation to pay the remaining balance they owed on the loan. *Id*. (discussing *Hagy*, 882 F.3d at 622-23). The plaintiff in *Hagy* therefore lacked Article III standing.

*Buchholz* next considered *Macy v. GC Servs. Ltd. P'ship*, 897 F3d 747, 758 (6th Cir. 2018). The Sixth Circuit placed *Macy* on an injury-in-fact spectrum: "*Macy*, another FDCPA case published several months after *Hagy*, falls on the other end of the spectrum than *Hagy*: the *Macy* plaintiffs alleged a procedural violation that turned out to be an injury in fact." *Buchholz*, 946 F.3d at 868. The FDCPA transgression in *Macy* occurred when the debt collector neglected to inform the plaintiffs that they could obtain verification of the debt's validity only if they disputed it in writing within 30 days. The plaintiffs had standing in *Macy* because the particular FDCPA violation "placed [them] 'at a materially greater risk of falling victim to abusive debt collection practices.'" *Id*. (quoting, in part, *Macy*, 897 F3d at 758).

*Buchholz* next analyzed *Demarais v. Gurstel Chargo, P.A.*, 869 F3d 685 (8th Cir.

16

2017). Although the plaintiff in *Demarais* alleged only intangible injuries, the Eighth Circuit found that he had suffered a concrete injury in fact stemming from the debt collector's attempt to use civil judicial proceedings to collect a debt he did not owe. The court in *Demarias* found, "Having alleged a harm that Congress intended to prevent— and that resembled a harm recognized at common law—the plaintiff satisfied Article III's injury-in-fact requirement." *Buchholz*, 946 F3d at 869-70 (discussing *Demarais*, 869 F3d 691-92).

And what about the alleged injury in fact in *Buchholz* itself? *Buchholz* falls on the *Hagy* end—*i.e.*, no Article III standing—of the FDCPA's spectrum of injury-in-fact cases. *See id*. at 870. The claimed FDCPA violation in *Buchholz* occurred when a debt collector sent the plaintiff a collection letter giving the false impression that an attorney had reviewed his case and confirmed that the plaintiff owed certain debts. The Sixth Circuit assumed the debt collector's act of giving the plaintiff a false impression violated the FDCPA but found no resulting harm, let alone harm Congress intended to prevent, for two reasons: (1) the plaintiff gave no reason (e.g., statute of limitations) to find he did not owe the debt, and (2) he did not allege an omission or misstatement caused him to waive a procedural right (unlike the plaintiff in *Macy*). The Sixth Circuit then found that the plaintiff failed to identify a similar common-law violation. Neither abuse of process, malicious prosecution, nor intentional infliction of emotional distress aligned with the plaintiff's allegations. He therefore failed to show he suffered a concrete injury in fact. *Id*.

This leads back to Pastian's case.

17

**3.**

"[A]lthough '[Pastian] bears the burden of establishing' the elements of standing, to support [her] standing at the summary judgment stage [she] must only 'set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken as true.'" *American Civil Lib. Union of Ohio Found'n, Inc. v. DeWeese*, 633 F.3d 424, 430 (6th Cir. 2011) (quoting, in part, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130 (1992)).[4]   "[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth*, 422 U.S. at 500 (citation omitted).

Because Pastian must establish standing for each of her FDCPA claims, *see Hagy*, 882 F.3d at 620, each must be examined for a concrete injury in fact.

***Claim One***

Pastian argues that Lachman's first voicemail message violated the FDCPA, 15 U.S.C. § 1692e(3), (5), and (10) by falsely implying the existence of a legal action. Remember:  He stated in his message that he was calling about "a legal matter…." (Doc. #48, *PageID* #365).  Pastian finds this an FDCPA violation akin to a common-law action for malicious prosecution.  She contends, "Congress clearly intended to prevent the threat of legal proceedings, in some contexts, to deceive consumers to pay on a debt.  This establishes a concrete injury without the need for Ms. Pastian to prove any additional harm."  (Doc. #62, *PageID* #733).  Nevertheless, she further contends that this FDCPA

---

[4] "And at the final stage, those facts (if controverted) must be 'supported adequately by the evidence adduced at trial.'" *Lujan*, 504 U.S. at 561 (citation omitted).

violation caused her concrete intangible harm because "'upon hearing the voicemail, [she] felt sick and panicked.'" *Id.* at 734.

Pastian's arguments look promising at first because she accurately compares her claim to common law malicious prosecution, *see Buchholz*, 946 F.3d at 869-70, and she reasonably describes Congress's goal to prevent debt collectors from threatening legal proceedings to deceive consumers. The problem, however, is that her particular claim—a single voicemail message during which Lachman said he wanted a return call concerning a "legal matter"—at most refers to a "bare procedural violation 'divorced from any concrete harm' …." *Id.* (quoting, in part, *Spokeo*, 136 S.Ct. at 868). The voicemail message did not create a risk of real harm because it did not place Pastian in a situation in which she might waive rights created by the FDCPA or place her "at a materially greater risk of falling victim to 'abusive debt collection practices.'" *Macy*, 897 F.3d at 758 (quoting, in part, § 1692(e)).

Pastian contends that her emotional injuries were concrete because they stemmed from the implication that she or her husband was already in some kind of legal trouble, rather than from a fear of potential future harm. Her emotional injuries, however, equate to the anxiety alleged in *Buchholz* over possible future events. The plaintiff's anxiety in *Buchholz* arose after he received certain letters—he "'felt an undue sense of anxiety that he would be subjected to legal action if prompt payment [on his debts] was not made.' In other words [the plaintiff] was worried about being sued at some point in the future." 946 F.3d at 865 (citation omitted; brackets in original). So it is in Pastian's situation where, upon hearing Lachman's voicemail about a legal matter, she felt sick and panicky.

19

These emotions "amount[ ] to the fear of future harm" identified in *Buchholz*. *Id*. Her "legal matter" could not generate concrete harm without future action. "When a plaintiff claims to have standing based on the threat of a future injury, it is not enough that the future injury is reasonably likely to occur—the 'threatened injury must be certainly impending.'" *Buchholz*, 946 F.3d at 865 (quoting, in part, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).

Pastian therefore lacks a concrete injury in fact resulting from Lachman's reference to a legal matter in his voicemail message on June 6, 2017. She therefore lacks standing to litigate her first FDCPA claim.

**Claim Two**

Pastian contends that Lachman's June 6, 2017 voicemail violated the FDCPA, § 1692e(11), because he failed to identify himself or ICS as a debt collector and failed to inform her that the call concerned an alleged debt. According to Pastian, this "is a textbook example of deception through omission." (Doc. #62, *PageID* #735). She argues that juxtaposing *Hagy* with her situation is instructive. She observes that her situation is the opposite of *Hagy*: Lachman's voicemail did not provide good news to her; he instead attempted to get her to pay a disputed debt. She also maintains that Congress was well within its right to elevate this type of harm, which is analogous to common-law fraud. She thus concludes that she has standing without an allegation of additional harm. This conclusion is correct.

"[T]he statutory provision at issue here, 15 U.S.C. § 1692e(11), was established to protect concrete interests, as opposed to purely procedural rights." *Driesen v. RSI*

*Enterprises Incorporated*, CV-18-08140-PCT-DWL, 2019 WL 283646, at *2 (D. Ariz. 2019). This particular section of the FDCPA requires debt collectors "to disclose in initial written communications with the consumer .... that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose ...." § 1692e(11). In subsequent communications, the debt collector must disclose to the consumer "that the communication is from a debt collector ...." *Id.* Pastian adequately alleges she incurred a concrete injury in fact when Lachman failed to identify himself as a debt collector in his voicemail message on June 6, 2017. Her concrete injury falls at the *Macy* end of the spectrum because Lachman's omission of information required by §1692e(11) created a risk that she might volunteer detrimental information when she returned his phone call. *See Driesen*, 2019 WL 283646, at *3 (violation of § 1692e(11) disclosure requirements constituted a concrete injury without need for additional harm by "creat[ing] a risk that Driesen might volunteer information to her detriment during subsequent interactions with [a debt collector].").

Pastian therefore has standing to continue to litigate her second FDCPA claim.

**Claim Three**

The FDCPA, § 1692e(2)(A), prohibits debt collectors from falsely representing "the character [or] amount ... of any debt...."

Pastian asserts that ICS's May 31, 2017 letter violated § 1692e(2)(A) by misrepresenting the character and amount of the alleged debt it was trying to collect from her. She contends that this statutory violation caused her an injury in fact without requiring her to show she suffered additional harm. She is correct.

21

The violation of § 1692e(2)(A) she alleges correlates with common-law fraud and the judgment of Congress in preventing debt collectors from attempting to collect more than a consumer owes. Pastian's claim that ICS's letter crossed this statutory line goes to the substantive heart of the FDCPA. And it falls at the *Macy* end of the concrete injury-in-fact spectrum by creating the risk that she would fall victim to paying an amount she did not owe. *Cf. Macy*, 946 F.3d at 869 ("the defendant's letter placed the plaintiffs 'at a materially greater risk of falling victim to an 'abusive debt collection practice.'" (citations omitted)). As a result, to show a concrete injury in fact, she need not allege an injury beyond her claim that ICS misrepresented the character and amount of her debt in violation of § 1692e(2).

Pastian therefore has standing to continue to litigate her third FDCPA claim.

**Claim Four**

Pastian finds that her next concrete injury in fact occurred—without the need for her to show additional harm—when ICS threatened to negatively report credit information even though it knew she disputed the underlying debt in violation of the FDCPA, §§ 1692e(5), (8). She says that ICS was well aware that she disputed the underlying debt because she had already filed the present case (in July 2017) at the time of the threats in emails to her attorney (in September 2017).

Section 1692e(5) broadly forbids debt collectors from "threaten[ing] to take any action that cannot be legally taken or that is not intended to be taken." Section 1692e(8) more specifically forbids debt collectors from "threaten[ing] to communicate to any person credit information which is known, or should be known to be false, including the

failure to communicate that a disputed debt is disputed."

Pastian argues that her claim that ICS ran afoul of § 1692e(8) in its emails to her attorney suffices to show she has a concrete injury in fact without the need for her to demonstrate additional harm. She is right. Her claim is analogous to common law abuse of process or malicious prosecution. Congress's judgment in enacting § 1692e(8) sought to prevent the variety of negative effects that reporting inaccurate credit information can cause. "For instance, it is 'a red flag to the debtor's other creditors and anyone who runs a background or credit check, including landlords and employers.'" *Evans v. Portfolio Recovery Associates, LLC*, 889 F.3d 337, 345 (7th Cir. 2018) (quoting *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076, 1082 (7th Cir. 2013) (quoting, in turn, *Tyler v. DH Capital Mgmt.*, 736 F.3d 455, 464 (6th Cir. 2013)). These negative effects can be so severe that even a threat by a debt collector to report disputed information is an inherently abusive, injurious, and coercive shakedown because it forces the debtor with a legitimate ground for disputing a debt to choose between waiving the right to challenge the debt or risk long-lasting negative financial consequences. This type of concrete harm falls on the *Macy* end of the spectrum. And because Pastian's allegations place her in this untenable situation, she presents a concrete injury in fact without the need to show additional harm.

Pastian therefore has standing to continue to litigate her fourth FDCPA claim.

**Claim Five**

Pastian claims that Lachman's outrageous conduct during the two phone conversations (one on June 6, 2017; one on June 13, 2017)—including the use of obscene

23

or profane language and threatening her with possible jail time if she did not pay the debt—caused her concrete injuries without the need to show additional harm. Pastian also contends that Lachman's conduct caused her concrete injuries in fact—namely, emotional harm.

The issue of whether Lachman's allegedly outrageous conduct actually caused Pastian a concrete injury in fact need not be presently resolved because her alleged emotional harm serves to show, at this stage of the case, that she suffered a concrete injury in fact. Although the *Buchholz* majority was skeptical that emotional harm can constitute an injury in fact in FDCPA cases, Judge Murphy set forth a convincing rationale for finding mental distress, when sufficiently particularized, satisfies standing's concreteness requirement. *Supra*, § IV(B)(2).

Additionally, district courts within the Sixth Circuit have recognized such harm as compensable under the FDCPA based on its remedial language:

> If a debt collector is found to have violated the FDCPA, a court may award "any actual damage sustained by such person as a result of such failure" and "in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000 ..." 15 U.S.C. § 1692k(a)(1) & (a)(2)(A). "Courts in this Circuit generally allow recovery for emotional distress damages under the FDCPA."

*Croft v. ALD, LLC*, 2017 WL 762255, at *2 (E.D. Mich. 2017)[5] (quoting *Davis v. Creditors Interchange Receivable Mgmt., LLC*, 585 F.Supp. 2d. 968, 971 (N.D. Ohio 2008)); *see Wallace v. Washington Mut. Bank, F.A.*, 683 F.3d 323, 326 (6th Cir. 2012)

---

[5] Report & Recommendation adopted, 2017 WL 747579, at *1 (E.D. Mich. 2017).

(recognizing, "[1692k] allows the consumer to recover statutory or actual damages for

violations of the Act.").  And one district judge has cogently explained:

> The FDCPA's drafters were greatly concerned about emotional
> harms inflicted by abusive debt collectors.  The Congressional
> findings note that abusive debt collection causes "marital instability"
> and "invasions of individual privacy" along with economic harms like
> "personal bankruptcies" and "loss of jobs."  15 U.S.C. § 1692(a).  The
> Senate Committee noted that abusive debt collectors cause "suffering
> and anguish." S. Rep. 95–382, at 2, U.S. Code Cong. & Admin.News
> 1977, pp. 1695, 1696.  The Committee expressed concern about
> practices that take a primarily emotional toll, such as using "obscene
> or profane language, threats of violence, telephone calls at
> unreasonable hours, ... [and] disclosing a consumer's personal affairs
> to friends, neighbors, or an employer."  *Id.*  Courts construing the
> FDCPA have noted Congress's concern for emotional harms.  *See
> Crossley v. Lieberman,* 90 B.R. 682, 692 (E.D. Pa.1988); *Teng v.
> Metropolitan Retail Recovery, Inc.,* 851 F.Supp. 61, 68-70 (E.D.N.Y.
> 1994).

> If courts demanded plaintiffs victimized by these practices meet
> the tort standard for emotional distress, recovery might often, if not
> nearly always be unlikely.  *See Greene v. Rash,* 89 F.R.D. 314, 316
> (E.D. Tenn.  1980) ("the aggrieved plaintiff would not be able to
> recover any actual damages under 15 U.S.C. § 1692k(a)(1), except to
> the extent that he or she might have suffered some related out-of-
> pocket expenses."); *Smith, supra,* 124 B.R. at 188 n. 6, ("[e]xisting
> state laws would, in many cases afford no relief at all to the victim[s]
> of abusive debt collection practices.").

*Davis v. Creditors Interchange Receivable Management, LLC*, 585 F.Supp.2d 968, 973 (N.D.

Ohio 2008).

For these reasons, Pastian's allegations of her actual emotional harm caused by

Lachman's allegedly outrageous conduct during the June 2017 phone calls are adequate

to show, at this stage of the case, that she has standing to litigate her related fifth FDCPA

claims.  *See Buchholz*, 946 F.3d at 873  (Murphy, J. concurring in part and in the

judgment) ("If a plaintiff's claim is sufficiently particularized…, I tend to think that mental distress satisfies any additional concreteness requirement. I reach that conclusion for a simple reason: It comports with a long tradition of allowing plaintiffs to sue for mental-distress damages.").

*Summary*

Pastian has standing to continue to litigate her second through fifth claimed violations of the FDCPA. The statutory violations she alleges together with her particular emotional injuries demonstrate at this stage of the litigation that she has a concrete, non-abstract personal stake in the outcome of these claims. *See Warth,* 422 U.S. at 498-99 ("[T]he standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his [or her] invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his [or her] behalf.").

## V.     Summary Judgment

Pastian contends she is entitled to summary judgment on the merits of her FDCPA claims because genuine issues do not exist over the material facts supporting each of ICS's FDCPA violations.

**Claim One**. Pastian lacks Article III standing on her first FDCPA claim. *See supra*, § IV(B)(3). Consequently, she is not entitled to summary judgment on her claim that Lachman and ICS violated the FDCPA by referring to a "legal matter" in his voicemail message.

**Claim Two**. Pastian is entitled to summary judgment her second claim that Lachman

and Tran violated the FDCPA in the voicemail messages each left by failing to identify himself or ICS as a debt collector. There is no genuine factual dispute that Lachman left the first voicemail and Tran left the second voicemail, or about the contents of those voicemails, including the failure of each to identify himself or ICS as a debt collector. In light of these facts, a jury could reach but one reasonable conclusion—that the voicemail messages violated § 1692e(11).

**Claim Four**. Pastian is entitled to summary judgment on her fourth FDCPA claim. There is no genuine factual dispute over the contents of the emails, including his threat to negatively report her credit information. In light of these facts, a jury could reach but one reasonable conclusion—that the voicemail messages violated § 1692e(8).

**Claims Three and Five**. On her two remaining FDCPA claims Pastian is not entitled to summary judgment in her favor. Plaintiff has not established an absence of genuine issues of material fact and that she is entitled to judgment as a matter of law on her third FDCPA claim concerning the character and amount of the debt she owed, if any, to Everybody Fitness. Furthermore, genuine issues of material fact remain concerning whether Lachman used obscene, profane, or threatening language during his two phone conversations with Pastian in June 2017. During Pastian's deposition, she alleged he used such language. He denied it during his deposition. Credibility issues therefore remain and preclude summary judgment in Pastian's favor on her fifth FDCPA claim.

Lastly, Pastian's request for a damages hearing is denied at this point in the case because she is not entitled to summary judgment in her favor on the merits of her first, third, and fifth FDCPA claims.

27

**IT IS THEREFORE ORDERED THAT**:

1.     Plaintiff's Motion for Partial Summary Judgment (Doc. #48) is granted, in part, on the merits of her second and fourth FDCPA claims;

2.     Plaintiff's Motion for Partial Summary Judgment (Doc. #48) is denied in remaining part; and

3.     Plaintiff's first FDCPA claim is dismissed *sua sponte* for lack of standing and jurisdiction.


November 3, 2020                              *s/Sharon L. Ovington*
                                             Sharon L. Ovington
                                             United States Magistrate Judge

28